Teri B. Himebaugh, Esq.
PA ID 53603
1400 Spring Garden St. #911
Philadelphia, PA 19130
(484) 686-3279
thimebaughesq@earthlink.net

# IN THE U.S. DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUSTIN HEARD | ) | |
|     Petitioner | ) | |
| | ) | |
|   vs. | ) | |
| | ) | |
| | ) | NO: |
| | ) | |
| KEVIN RANSOME, SUPERINTENDENT | ) | |
| SCI DALLAS ET AL | ) | |
|     Respondents | | |

## PETITIONER'S
## MOTION FOR RELIEF PURSUANT TO RULE 60(b)

Petitioner, Justin Heard by and through counsel, Teri B.  Himebaugh, Esq., hereby files the instant Motion for Relief pursuant to Rule 60 which provides for federal review of a claim based on the discovery of new evidence which could not have been previously discovered through due diligence.

### FACTUAL SUMMARY

According to co-defendant Kevin Hiller's statement to Homicide Detectives and his FBI proffer, in early 2006 co-defendant Stanley Pettus conspired with Hiller to rob the home of Abdul Wyatt (aka "Buddy") who was

1

a drug dealer. Hiller enlisted the help of Christopher Knight (aka "Smiley") and the Petitioner (aka "Yiddy"). On March 21, 2006 Hiller, Knight and Petitioner went to Wyatt's home. Knight and Petitioner entered the home and went to the basement, where they were confronted by Wyatt and Jenesta Jones. An altercation ensued during which a single shot was fired. Jones was shot in the center of her chest. The bullet exited Jones right breast and struck Wyatt in the neck killing him.  (P1, P4).

After they came out of the house they drove away. Hiller followed them in his car. Hiller who had a police scanner had heard about the fatal shooting. Knight told Hiller that the victim's aunt had answered the door and ran back inside when she saw it was a robbery. The aunt ran down the steps into the basement followed by Petitioner and Knight. Both Knight and Petitioner said that the drug dealer looked like he was making a move so Petitioner "popped him in the head". Knight dropped his cell phone during the incident. Knight said that he "popped" the lady because she was screaming. Petitioner took one of the vehicles to go get a new SIM card for the cell phone so that if it was found it would be useless to investigators. (P1, P4).

Co-defendant Kevin Hiller gave a proffer to the FBI on May 7, 2007 and a statement to Homicide Detectives on May 21, 2007 related to this case. (P1, P3). When Hiller gave this proffer he believed that it could be

used against his co-defendants but not him. (P5; Commonwealth v. Dooley, pg. 150)

## PROCEDURAL POSTURE

On October 5, 2007 Petitioner was arrested. A jury trial before the Honorable Renee Caldwell Hughes ended in a mistrial. Jury selection recommenced November 9, 2009. Mid trial, on November 13, 2009, Petitioner entered into a negotiated guilty plea to one count of third-degree murder, conspiracy to commit murder and possession an instrument of crime. (CP-51-CR-0004950-2008). The trial court imposed 17½ to 35 years of incarceration, concurrent with the two to four years sentence that the Petitioner was already serving on drug charges at CP-51-CR-0707191-2005. Petitioner did not file a direct appeal.

On May 20, 2016, Petitioner filed a counseled PCRA petition, alleging the newly discovered fact that one of his codefendants, Kevin Hiller, who would have testified against Petitioner at trial, had denied knowledge of the murders in his testimony in a separate, unrelated proceeding. The Commonwealth filed a motion to dismiss the petition on February 6, 2018, and Petitioner filed a counseled response on May 29, 2018. The PCRA court dismissed the petition without a hearing as untimely on August 30, 2018.

Petitioner thereupon filed a timely Notice of Appeal to the Superior Court. (2750 EDA 2018). The Superior Court denied relief.

3

Petitioner thereafter filed a timely Petition for Allowance of Appeal to the Pennsylvania Supreme Court, which was denied on May 6, 2020.

Petitioner did not file a federal habeas petition within one year of his conviction, as a result, he is not entitled to now file a 'first' federal habeas.[1] The instant petition, made pursuant to Rule 60(b), has been filed within one year of the date on which the factual predicate of the claim could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1)(D); Rule 60(c)(1).

## STANDARD OF REVIEW

Rule 60(b) allows a party to seek relief from a final judgment for various reasons including fraud, mistake, and newly discovered evidence. *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005).

To be entitled to relief from a judgment under Rule 60(b)(6), a movant must show the existence of "extraordinary circumstances suggesting that the party is faultless in the delay." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 393 (1993).  Newly discovered evidence can provide a basis for the finding of extraordinary circumstances. *Moolenaar v. Gov't of the Virgin Islands*, 822 F.2d 1342, 1346 (3d Cir. 1987); *Cox v. Horn*, 757 F.3d 113, 120 (3d Cir. 2014); *Twelve John Does v.*

---

[1]     Should this Court determine that Rule 60 does not apply, Petitioner alternatively avers that the instant petition should be considered a first habeas corpus petition and that equitable tolling provisions should apply. *Brinson v. Vaughn*, 398 F.3d 225, 230 (3d Cir. 2005).

*District of Columbia*, 268 U.S. App. D.C. 308, 841 F.2d 1133, 1140 (D.C. Cir.1988); *Stradley v. Cortez*, 518 F.2d 488, 493 (3d Cir. 1975); *Landano v. Rafferty*, 897 F.2d 661 (3d Cir. 02/27/1990) (The court cannot conceive of circumstances more "extraordinary" than those presented here, where a prisoner presents evidence that he was convicted without the benefit of exculpatory evidence).

Where a habeas petitioner challenges a judgment applying a procedural default, a motion filed under Rule 60(b) may not be construed as a successive petition, but instead, must be addressed under law governing Rule 60(b) motions. *Gonzalez*, supra at 532 n.4.

**ARGUMENT**

### I.    <u>The newly discovered evidence</u>

It was not until March 23, 2016 that Petitioner discovered that Hiller had also testified in a completely unrelated case: *Commonwealth v. Lerex Dooley*, 209 Pa.Super. 519 (1967)(CP-51-CR-0008960-2007)(P6). The *Dooley* trial began November 24, 2008 and concluded on December 2, 2018. (P5, P6, P10).

In Dooley's appeal to the Superior Court he averred that the Commonwealth withheld *Brady* evidence that his co-defendant Hiller had been involved in a double shooting/homicide - this double shooting. Dooley also averred that the prosecution committed misconduct by presenting

Hiller's perjured testimony about his lack of involvement in the double
shooting/homicide. The Superior Court held both of Dooley's claims waived.
(P6).

At the trial in *Dooley*, Hiller testified for the Commonwealth. On cross-
examination Hiller was asked:

> Q.   Isnt it true you tried to solicit his (Dooley's) help in
>      assisting you in that armored car robbery?
>
> A.   Yes I did.
>
> Q.   And isn't it true that you also told Mr. Dooley about two
>      other homicides you committed?

(P5 *Commonwealth v. Dooley*, CP-51-CR-0008960-2007, N.T. pg. 179). The
prosecution objected.

> P:    He asked him (Hiller) about telling him about two
>       homicides that he committed.
>
> Court: Well homicide would not be admissible as crimen falsi. So
>       under what theory, other theory are you—
>
> D:    It's a motive for lying. If he told him about two homicides,
>       that's definitely a motive for him to come in here and lie
>       on him. . . . To get back at him, to get him in jail, to
>       discredit him, you know. I mean, if he gets hit for a
>       robbery, that's additional crimen falsi with respect to him.
>       . . It kills him in terms of getting back to testify --

(P5 *Commonwealth v. Dooley*, CP-51-CR-0008960-2007, N.T. pg.184-185).

> Q.   Mr. Hiller, I left off asking you that, isn't it – you testified
>      that you had tried to solicit Mr. Dooley to participate in an
>      armed robbery. Then I asked you the question, that isn't it
>      true you also confided in him with respect to double
>      homicides, correct?

> A.     No sir.

> Q.     Okay.

> A.     I know nothing of it.

(P5 *Commonwealth v. Dooley*, CP-51-CR-0008960-2007, N.T. pg. 196).  On

re-direct examination, Hiller testified:

> First of all, I don't know nothing about no homicide, no
> double homicide. And he knew I was – he knew – he had
> an idea that I was telling on him.

(P5 *Commonwealth v. Dooley*, CP-51-CR-0008960-2007, N.T. pg. 220). On

re-cross, Dooley's attorney asked Hiller

> Q.     Okay. And you testified earlier that you never confided or
> you never mentioned to Mr. Dooley about any homicides,
> correct?

> A.     *Definitely not.*

(P5 *Commonwealth v. Dooley*, CP-51-CR-0008960-2007, N.T. pg. 203).

Dooley's attorney then had Hiller read a letter he had written:

> Q.     You just testified that you didn't say anything about – that
> you didn't tell him about the double homicides, were you
> lying in that letter? . . .  When I asked you, didn't you tell
> my client (Dooley) about a double homicide, you testified
> under oath which is perjury -- .   .   .  You are under oath
> today—

> A.     I said that under oath, but I never told you that I knew
> anything about a double homicide. What happened was ---

(P5 *Commonwealth v. Dooley*, CP-51-CR-0008960-2007, N.T. pg 212).

Notably, the federal court on review of the *Dooley* case found that the

PCRA Court had erred when it found that here was no evidence presented

that Hiller was involved in a homicide. The federal court held that "(b)ecause the 2007 Agreement connects Hiller in some way to murder we can agree that the PCRA Court's conclusion was questionable". (P10, pg. 10).

## II.  Petitioner used due diligence and extraordinary circumstances suggest that Petitioner is faultless in the delay in presenting the instant claim.

The State Court found that Petitioner did not use due diligence in presenting the *Dooley* documents. (PCRA Court Opinion, 11/26/18, pg. 9). Petitioner avers that this finding is an unreasonable application of the law. *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

The diligence requirement "does not demand a showing that the petitioner left no stone unturned" or that he used the "maximum feasible diligence." *Ramos-Martinez v. United States*, 638 F.3d 315, 324 (1st Cir. 2011); *Munchinski v. Wilson*, Warden of the State Correctional, 694 F.3d 308 (3d Cir. 09/11/2012). Rather, "[t]o determine if a petitioner has been [reasonably] diligent in pursuing his petition, courts consider the petitioner's overall level of care and caution in light of his or her particular circumstances." *Doe v. Busby*, 661 F.3d 1001, 1013 (9th Cir. 2011); *Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004); *In re Wogenstahl*, 902 F.3d 621, 629 (6th Cir. 2018); *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2000); *Solorio v. Muniz*, 896 F.3d 914, 920-21 (9th Cir. 2018) .

In other words, the diligence inquiry is fact-specific. There are no bright line rules as to what conduct is insufficient to constitute reasonable diligence.

> AEDPA does not impose a one-size-fits-all requirement. Rather, what due diligence requires depends on the circumstances of each petitioner: who he is, what facts he knows, what claim he seeks to bring, and what he can reasonably expect in view of his circumstances and the nature of that particular claim. This conclusion flows from the statutory text and is well settled in the case law of this Circuit and others. It also comports with decisions interpreting identically worded due diligence requirements elsewhere in AEDPA, as well as closely related diligence requirements in the habeas context more generally.

> We begin, as is customary, with the text. *Ross v. Blake*, 136 S.Ct. 1850, 1856 (2016). The subject matter of § 2244(d)(1)(D) is the "factual predicate" of the habeas claim, meaning the facts "out of which the point of law arises," *Fact*, Black's Law Dictionary (6th ed. 1990); *see also Fact*, Black's Law Dictionary (11th ed. 2019) (noting that by 1899, "predicate fact" meant "[a] fact from which a presumption or inference [of the existence of the claim] arises").

> And the trigger for that provision's one-year clock is the date on which those facts "could have been discovered through the exercise of *due diligence*." 28 U.S.C. § 2244(d)(1)(D) (emphasis added). That language is critical. In the law, "due diligence" is a relative term; it is "[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case." *Diligence*, Black's Law Dictionary (6th ed. 1990). Put another way, due diligence is the care "expected from a man of ordinary prudence," which is "measured with reference to the particular circumstances." *Id.* So by its plain terms, § 2244(d)(1)(D) requires us to determine when, in "the particular circumstances" at issue here, we should "expect[]" a "reasonable" petitioner to discover the facts giving rise to a habeas claim.

That is precisely what our case law requires. We have long held "that, to satisfy § 2244(d)(1)(D)'s 'due diligence' standard, a prisoner must exercise 'reasonable diligence in the circumstances.'" *Wilson v. Beard*, 426 F.3d 653, 660 (3d Cir. 2005) (quoting *Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004)). That inquiry "is context-specific," and "[t]he fact that we require a petitioner in one situation to undertake certain actions does not necessitate that we impose the same burden on all petitioners." *Id.* at 661.

We have also laid down important markers guiding courts in assessing what due diligence requires. "It is not enough," we have cautioned, "that [a petitioner] could have learned about [the factual basis for his claim] by happenstance" or "that [he] could have discovered [it] fortuitously." *Id.* at 660. Nor must a petitioner "continuously monitor [public sources] for [years] . . . on the unlikely chance that he might learn something which would be useful to his case." *Id.* at 661 (internal quotation marks and citation omitted).

Rather, § 2244(d)(1)(D) requires that we focus on the "reasonable expectations" of someone "in the petitioner's position," because a petitioner will have an obligation to investigate only once he has a "reasonable basis . . . to expect that [investigation] would uncover . . . relevant information." *Id.* In short, unless "the petitioner should be expected to take actions which would lead him to the information," *id.* at 662, his decision not to investigate "[i]s not a failure to exercise due diligence, "[11] *id.* at 661.

*Bracey v. SCI Rockview*, Third Cir. No. 17-1064 (1/20/21).

If a petitioner "did what he reasonably thought was necessary to preserve his rights . . . based on information he received . . . , then he can hardly be faulted for not acting more "diligently" than he did." *Holmes v. Spencer,* 685 F.3d 51, 65 (1st Cir. 2012).

At all times material the Petitioner was an incarcerated individual. He had very limited ability and means to conduct investigation of his case post-

10

conviction. In addition, in that he had taken a plea, he knew that he had little to no avenues open to him to ever gain relief.

Petitioner had no reason to know that Hiller was charged in the *Dooley* case, much less that Hiller was going to be a cooperating witness in that case. Nor could he have *ever* predicted that at the Dooley trial Hiller would deny knowledge of/involvement in the instant double shooting/homicide.

Even if the Petitioner had access to the court docketing database, there is no way for him to search it to find out who the witnesses were who testified in a particular case or what they testified to. It is simply unreasonable to require every defendant who has co-defendants to identify and obtain copies of all the notes of testimony from every possible case a co-defendant may be involved in either as a witness or defendant - in perpetuity- in order to establish his due diligence. There is no requirement, that in order to be diligent, a petitioner must "continuously monitor public sources for years . . . on the unlikely chance that he might learn something which would be useful to his case." *Bracey, supra; Wilson v. Beard*, 426 F.3d 653, 660 (3d Cir. 2005).

Moreover, Petitioner cannot be found untimely for not obtaining the above cited testimony prior to when he did even if the *Dooley* notes of testimony were considered a 'public record'. *Commonwealth v. Small*, _____ A.3d _____, 2020 WL 5833781 (Oct. 1, 2020); *Dennis v. Sec'y*, 834 F.3d

11

263 (3d Cir. 2016). Petitioner was thus, reasonably diligent in identifying and obtaining the *Dooley* records.

The State Court ruled that Petitioner produced no evidence of the date on which Hiller gave his testimony, and therefore Petitioner failed to plead or prove that he exercised due diligence in learning of Hiller's testimony. (PCRA Court Opinion, 11/26/18, pg. 9). Petitioner avers that the state court ruling was factually incorrect and/or based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Parker v. Matthews*, 567 U.S. 37, 40-41 (2012).

In his counseled PCRA petition and his appeal to the Superior Court therefrom, it was specifically pled that the petition was timely filed within 60 days of the date that the new evidence had been discovered. P2, pg. 5, ¶21; P3, pg. 7,10. This Court can take judicial notice of the fact that the petition was filed on May 20, 2016. This is undisputed. Therefore, based on the pleadings, the newly discovered evidence had to have been found on or after March 21, 2016. Petitioner's compliance with this deadline was evident from the pleadings. However, had the state court granted a hearing, Petitioner could have provided more specificity. He would have testified that the newly discovered evidence had in fact been discovered on March 23, 2016. (P3, pg. 10).

The Petitioner has thus met his burden of rebutting the presumption of correctness of the state court's factual findings by clear and convincing

evidence. 28 U.S.C. § 2254(e)(1); *see Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

### III.  <u>Use of the newly discovered evidence</u>

While it may have been an requirement in State Court to establish that the new evidence could not have been used solely for purposes of impeachment, that is an entirely irrelevant inquiry for purposes of a Rule 60(b) proceeding. The fact that the new evidence would serve to impeach Hiller is entirely immaterial to the Rule 60(b) analysis. *Bracey v. SCI Rockview*, Third Cir. No. 17-1064 (1/20/21); *Calderon v. Thompson*, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (U.S. 04/29/1998)

Moreover, even if the new evidence could not be used for purposes of impeachment, Petitioner could still have used the new evidence for substantive purposes. His testimony in the *Dooley* case would establish that Hiller had a pattern/practice of committing a crime and then putting himself in a position to assert that he obtained inculpatory admissions from co-defendants whose assistance he had solicited. He then trades his testimony about those admissions with the Government/Commonwealth in order to receive a benefit in his multiple state and federal cases. These cases include, but are likely not limited to, *Commonwealth v Dooley* CP-51-CR-0008960-2007 and a Federal Brinks Truck robbery. (P5 *Commonwealth v Dooley* CP-51-CR-0008960-2007, N.T. pg. 163-164,178).

Hiller had it down to a science. So much so that he suggested to other inmates that they too follow his example and "jump into" cases for their benefit. According to a statement obtained by co-defendant's private investigator, Alphonso Tindal was celled with Hiller at the Federal Detention Center in 2008. In January of that year Hiller told Tindel that he should 'jump on some cases' like Hiller had done. Hiller went so far as to offer to give Tindel information about a case in order to let Tindel "jump in". (P8).

Therefore, had the defense in Petitioner's case had the newly discovered *Dooley* documentation, wherein Hiller denied any knowledge of the instant double shooting/homicide, they could have used it to impeach Hiller's testimony inculpating Petitioner in this case. They could have also used it substantively to establish that Hiller participated in the above discussed pattern/practice and to show the investigation and the evidence flowing from it was too unreliable to satisfy the Fourteenth Amendment.

## IV.   Prejudice

The PCRA Court erred in requiring the Petitioner to prove he would have been acquitted in order to establish prejudice.

Hiller was listed on the Commonwealth witness list. Hiller's testimony implicated the Petitioner, not just in the robbery, but also importantly as the shooter. The evidence suggests that there was a single shooter. The single bullet travelled through Jones breast, striking Wyatt in the neck and killing him.

14

Initially, the Commonwealth had sought Petitioners conviction for first or second degree felony murder, both of which carry a life sentence. Hiller's testimony made the Commonwealth's case for imposition of either first or second degree murder. The Commonwealth's offer of a plea to third degree murder was premised upon an understanding that if Petitioner did not take the plea and he was convicted, he would serve the rest of his life in prison. Thus, it was important to the Commonwealth that Hiller remain credible.

Hiller's self-serving testimony that he stayed behind when Petitioner and Knight went inside the house would make it appear to the Petitioner's jury (and importantly the sentencing judges in _Hiller's_ cases) that his role in this crime was relatively minor and that he had no idea anyone was going to get shot or killed. It placed the shooting squarely on Petitioner and Knight and not on Hiller.

Notably, in a previously obtained April 28, 2009 (post-trial) statement taken by a private investigator working on behalf of Knight, Hiller told Germaine Batin that he and one other guy went to rob Wyatt. Hiller and the other guy knocked on the door. After they gained entrance the victim asked them "Why you got to do this to me" Hiller admitted that he shot the boy and looked through the house for drugs, money and guns. (P7).

Hiller had good reason to lie about the Petitioner's involvement in the crime because by doing so, it shifted the blame away from him. In fact, Hiller told Batin that he was "going home on these young boys." (P7) Hiller

15

said that the reason he was bringing in all these people to the FBI proffer was because he didn't want to do federal time. (P7)

Similarly, according to a post-trial statement from Alphonso Tindal, who was celled with Hiller at the Federal Detention Center, Hiller told him that he was going to lie to the Feds about a homicide because he received 30 years for an armored truck robbery and he couldn't do all that time. (P8).

Hiller set up Petitioner and Knight because according to what Hiller told Batin he had a beef with Knight and his friend "Yiddy" (Petitioner) over money and drugs. (P7)

If Hiller had testified at Petitioner's trial the defense could have used the newly discovered testimony from the *Dooley* trial, wherein Hiller denied knowing anything about any homicide, to establish that Hiller simply could not be credible and believed. Hiller had no reason to lie during the *Dooley* trial about his involvement in the instant homicide due to his agreement with the government - and yet he did.

The jury could have concluded that Hiller was simply a liar who regularly set other people up to take the fall for crimes he committed. Confronted with the newly discovered *Dooley* transcripts, Hiller's testimony would have been found to be inherently unreliable and incredible.

A conviction violates due process of law if it is based on unreliable evidence. The Fourteenth Amendment Due Process Clause gives a defendant the constitutional right to a reliable and trustworthy conviction, *Stovall v.*

16

*Denno*, 388 U. S. 293 (1967); *Watkins v. Sowders*, 449 U.S. 341, 347 (1981) ("[it] is the reliability of identification evidence that primarily determines its admissibility"); *Foster v. California*, 394 U.S. 440 (1969); *Green v. Georgia*, 442 U.S. 95 (1979); *Gardner v. Florida*, 430 U.S. 349 (1977).

"The integrity of the adversary process depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance." *Taylor v Illinois*, 108 S. Ct. 646, 484 U.S. 400 (U.S. 01/25/1988). Here given the newly discovered testimony from the Dooley case, Hiller's testimony could hardly be considered sufficiently reliable to not violate Petitioner's due process rights.

Moreover, the other evidence of record inculpating the Petitioner was hardly so overwhelming that it would overcome the loss of the unreliable evidence from Hiller.

Jenesta Jones picked out a picture of another individual from the lineup. Petitioner was in the #4 position but she identified the man in the #2 position as the second person involved. (N.T. 10/20/09 pg. 237-238). She additionally testified that she told the detective when she looked at the lineup that she had been expecting to see the actual shooter. The detective

17

had apparently told her that she would in fact be seeing the shooter in the lineup. (N.T. 10/20/09 pg.237-243).

Terrell Boyd testified pursuant to a Memorandum Agreement. He was testifying for his own benefit and not because he was an upstanding citizen.

Cobbs statement contradicted Hiller's testimony about talking to the Petitioner.

Finally, there was evidence of an alternative suspect that was never investigated by the Homicide detectives. In Myron Walker's 4/7/06 statement to Det. Weaver and Det. Spotwood he stated that "Radio Raheem" had confessed to the crime. (P9)

A conviction – regardless of whether from plea or jury verdict- that is based on unreliable evidence cannot be sustained. *Stovall*, supra; *Taylor,* supra.

In denying the Petitioner relief, the PCRA court found that "Hillers admission or denial of his involvement in this crime would not have mattered, as the defendant pled guilty, and it would not have affected the outcome of this defendant's trial." (PCRA Court Opinion 11/26/18  pg. 8).

While it is true that Petitioner was colliquied and voluntarily pled guilty, this Court must know from its' experience with criminal cases that pleas are taken by defendants all the time regardless of whether the defendant is truly guilty or not. A plea can be taken by innocent individual after weighing the evidence against the potential of receiving an even worse

18

outcome. In this case, weighing 17½ to 35 years of incarceration against life in prison without the possibility of parole.

A defendant's waiver of his constitutional right to go to trial is a fundamental decision that must be made by the defendant. However, in order for a voluntary waiver by defendant to be intelligent, the decision must be rational under the circumstances  *Roe v Flores-Ortega*, 528 U.S. 470, 120 S.Ct. 1029 (2000).

A plea is only knowing and intelligent if it is based on <u>reliable evidence</u>. A reviewing court must look to the totality of the circumstances surrounding the entry of the plea when assessing whether the plea was voluntary, knowing and intelligent. *Commonwealth v. Allen*, 557 Pa. 135, 732 A.2d 582, 588 (Pa. 1999); *Commonwealth v. Muhammad*, 794 A.2d 378 (Pa. Super. 2002).

Had the Petitioner known that Hiller was going to deny any involvement in the instant homicide it would have altered the weight of the Commonwealth evidence. This would have impacted on his and his attorney's analysis of the evidence and the likelihood of a guilty verdict. Had Petitioner had the newly discovered evidence, Petitioner would have proceeded with the trial to verdict. He would not have taken the plea.

Thus, the result of the proceeding would have been different. Petitioner need not prove that he  would have been ultimately acquitted. Rather, he need only prove that the  result of *plea proceeding* would have

19

been different. *Commonwealth v. Walker*, 110 A.3d 1000 (Pa. Super 2015);

*Commonwealth v. Mallory*, 941 A.2d 686 (Pa. 2008) and *Commonwealth v.*

*Miller*, 987 A.2d 638 (Pa. 2009).

Petitioner respectfully requests that this Court grant him appropriate

relief including but not limited to the grant of a hearing on any contested

issues.

> To the limited extent that federal evidentiary hearings are
> available under AEDPA, they ensure that petitioners who
> diligently developed the factual basis of their claims in state
> court, discovered new evidence after the state-court proceeding,
> and cannot return to state court retain the ability to access the
> Great Writ. See ante, at 2 (ALITO, J., concurring in part and
> concurring in judgment). "When Congress codified new rules
> governing this previously judicially managed area of law, it did
> so without losing sight of the fact that the 'writ of habeas corpus
> plays a vital role in protecting constitutional rights.' " *Holland v.*
> *Florida*, 560 U. S. ___, ___ (2010) (slip op., at 16) (quoting
> *Slack v. McDaniel*, 529 U. S. 473, 483 (2000)). Allowing a
> petitioner to introduce new evidence at a hearing in the limited
> circumstance permitted by §2254(e)(2) does not upset the
> balance that Congress struck in AEDPA between the state and
> federal courts."

*Cullen v. Pinholster*, No. 09-1088 (U.S. 04/04/2011)(Breyer concurring and

dissenting opinion). Petitioner ultimately seeks the vacating of his conviction

by means of withdrawal of his plea. Petitioner avers that it would be

manifestly unjust to deny him this relief.

Respectfully submitted,

Teri B. Himebaugh, Esq.
Attorney for Petitioner, Brian Golson

20

## **CERTIFICATE OF SERVICE**

I certify that on this 6th day of February 2021, I electronically filed a copy of the foregoing Rule 60 petition with the Clerk of Courts using ECF and/or email, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

District Attorney of the County of Philadelphia

In addition, I mailed true and correct copies of said Petition to the following:

Philadelphia District Attorney's Office
3 S Penn Square
Philadelphia, PA 19107

Justin Heard HP0080
1000 Follies Road
Dallas, PA 18612-0286

Teri B. Himebaugh, Esq.
PA ID 53603